Good morning. My name is Jim McManus. I represent Rosalina Calonge, the mother of the young man who was killed in this case. Welcome to San Jose. I've been waiting for this for 56 years. It's nice to see the Ninth Circuit is here. And I salute Judge Friedland for her excellent choice of a venue for her chambers. May it please the court. In this case, the district court took us to task for failing to demonstrate in a particularized sense that the constitutional right to be free from the use of excessive force was sufficiently clear that a reasonable officer would understand what he was doing violated that right. I will be candid to say I was perplexed when I read that because it seems to me when a police officer shoots someone in the back without a warning what more particularity and clarity is needed. I think it's a pretty obvious case. I found a opinion of the Ninth Circuit, which I think supports the notion I call it the obvious case doctrine. And it's the state of a Geary versus county of Riverside. Twenty nine FF fourth six twenty four. And the court specifically stated, and I quote, although no body of relevant case law is necessary in an obvious case like this one, our precedents put the officer on notice. His specific conduct was unlawful. Two cases published about three years before the April twenty sixteen incident put it back to twenty thirteen. In our instance, it was twenty nineteen. Make clear to a reasonable officer that a police officer may not use deadly force against a nonthreatening individual, even if the individual is armed. If this is and even if the situation is volatile now in this particular case, if we look at the Graham versus Connor factors, number one, the severity of the crime at issue, the only crime that was mentioned was a misdemeanor. It's uncertain in those circumstances. Point two, whether the individual posed an immediate threat to the safety of the officers or others. Number three, whether the individual was actively resisting arrest or attempting to evade arrest by flight. There was never an arrest made or attempted here, and he basically just kept shuffling across the street. Now, the officer who shot him, Officer Carboni, his justification was that the high school was letting out and students at Reinhart and Jackson were at that intersection, which was north of where Mr. Kalonji was going. This is contradicted by the testimony of Officer Pedrera at ERO one twenty to one forty three. And also, importantly, by the. Well, don't we have to just take the version of the of what happened according to the plaintiff? Which was there was nobody around. Well, I think that's correct. I agree with that. And the officers claim that school is getting out and there were students at the intersection is belied by Officer Pedrera's testimony. And importantly, well, what I'm just trying to say is we on qualified immunity, if anybody argues that there's a that there's a factual dispute. Then you really don't a material factual dispute on what happened and you really don't belong. You really don't belong here. That is to say, we take the facts in the light most favorable. We resolve all conflicts. And we look at the facts in light most favorable to the non-moving party, which is your client. Right. And then we ask, could a jury find a violation of the Fourth Amendment, which is your main claim? And probably yes. And then we ask, well, at the time of the incident, was the law clearly established? And I guess your main argument seems to be that the district that the magistrate judge or the judge that ruled on this demanded basically an identical case. And your argument is, well, that's not what the Supreme Court requires. And in any event, there are cases that would lead a reasonable officer to understand you can't shoot somebody in the back. Under these circumstances. I would say that I'm in violent agreement with your comments. Well, I just you know, there's no need to. It's just that. I mean, I think you're right. And the conflict in the evidence is compelling. We submitted a video. It's ERO 162, which shows you can't see it, but you should look at this video if you haven't already. Here's Carboni getting ready to shoot my guy, my client's son, I should say. And he's right here in the median. And Carboni says, well, there I was concerned about students at this intersection. We don't see any students at the intersection. What we do see is a police car, which was Officer Pedrera's car, which easily could have blocked any further progress of Mr. Kalonji and those students. And he testified at his deposition, and that's at ERO excerpts of record 120 and 143. He did not see any students or anyone at that intersection. Now, there's other conflict that Carboni is a shooter. Let me ask you, because the Fourth Amendment obviously considers where the force was objectively reasonable. And given that Mr. Kalonji, is it Kalonji or Kalonji? I'm told his mother says the family name is Kalonji. Kalonji had ignored the officers and was walking towards a school with a gun tucked in his waistband as students were being released for the day. Why was it unreasonable for the officer to do what he did? Well, first of all, there's a dispute as to whether there was a gun in the waistband or not. And there's a dispute as to whether there was any concerning movement. There's a dispute about the gun in the waistband? Pardon me? I know that there's a dispute about the movement, but I didn't think there was a dispute about the gun in the waistband. Well, there were seven police officers out there with their cars and the red lights. And the only one that testified he saw what he said was the butt of a gun was Officer Carboni. And he said before he shot Mr. Kalonji that he saw a movement of Kalonji's arm in the area of what turned out to be a toy gun. So the movement is contested, but are you contesting that a reasonable officer observing the situation would have thought it was a real gun? I'm suggesting that if there are a number of people observing a situation and one says, I saw a gun and the others didn't see it. But they were called to the scene because bystanders saw him with a gun. I didn't think you were contesting the idea that the officers thought he had a gun. You might contest whether he was moving the gun, but I didn't understand you to be contesting that everyone thought he had a gun. Why were they there? I don't understand that argument at all. I think that really undermines... Is that a weak argument? I guess I shouldn't make it then, but my point here is what was visible to the officer is disputed. I mean, when they found the body, there was a toy gun there, so that's... And people had called, multiple people had called 9-1-1 saying that there's a guy with a gun, so they must have thought he had a gun, right? That's why they were there. Well, the evidence that would support multiple people was not considered by the magistrate based on our objection that it was not properly authenticated. Let me ask you this. What is your version of what happened? My version of what happened is that... Based on the evidence that's come out? Absolutely. It was presented to the district? Absolutely. What is your version of what happened? My version of what happened is that Mr. Kalonji was observed with what one citizen, not multiple citizens... Just say what your version of the events were on that day. All right. He was observed walking down Jackson in a shuffling fashion with his hand in his waistband. He got within eight feet of this line of police officers who were yelling contradictory commands at him like... And they were yelling, drop the gun, don't touch the gun. They all thought he had a gun, right? Well, they were all saying that. And maybe they did think that. But in answer to your question, he walks across in front of these police officers with kind of a silly smile on his face leading Mr. Carboni to believe that he might have a mental problem. And he keeps walking north. The evidence, in my judgment, is that there are no people at that intersection. There's a police car at the intersection. The officer at that intersection who was there right at the intersection says he didn't see any people there. And so the suggestion that he ought to shoot this guy in the back without a warning, I think that flies right in the face of the Ninth Circuit law. Okay. Now, the other side disputes much of that. Fair enough. And a trial may come out. They may win. They may. We're asking for a trial. We're asking for our day in court. So at the time they pulled that, when the officer pulled the trigger, shot him in the back, the circumstances right around that hole. Which is your best case that says a reasonable officer who might have been knowledgeable of the law in this area would have known, any reasonable officer would have known, that when he pulled the trigger in that circumstance, he would be violating, using deadly force, he would be violating the victim. The victim's constitutional rights. My best case is a state of Aguirre versus County of Riverside at 29F 4th 624. Okay. Okay. You didn't cite that in your briefs, did you? We did not cite that case because I didn't find it until this week. I apologize for that. But the court in the Aguirre case cited George versus Morris, which made it clear six years before this incident, declared to a reasonable officer that a police officer may not use deadly force against a non-threatening individual, even if the individual is armed and even if the situation is volatile. That was cited. That's the law in the Ninth Circuit. And it should be very clear, plainly clear. So I think those cases that George is about when someone has a gun, you can't shoot them unless they're lifting it. So I thought you had a pretty good argument about that. But I'm troubled by the switch that seems to be happening today to saying he didn't have a gun at all. I'm sorry if I've misstepped here because that's not my main argument. That's not my principal argument. My argument is that he was not threatening anybody at the time. There were no people to be worried about at the intersection. That's maybe disputed by the police, but that's what this photograph shows. And when Carboni says, the reason I shot was I saw some kind of movement from the arm and maybe the butt of a gun, Pedrera, who testified that he had Mr. Calangi in his sights for a solid minute and he did not see any movement or any gun, that's a conflict in the evidence. The justification Carboni makes is this movement that only he saw and that Pedrera specifically said, I was staring at this guy because I had my rifle on him. No movement. So, I mean, I just think it's clearly a case that needs to be tried. And I think the law is clear. It should be clear to any reasonable person or a reasonable officer. And there you have it. And I see the light's gone yellow. I don't know if I'm in trouble or not. Okay. Thank you. Thank you. Thank you. Good afternoon. If it pleases the court, Thomas Gray for defendant's appellees. I'll get right to the question at hand. Yes, many people saw Mr. Calangi with a gun. The 911 callers saw him with a gun. Officer. They didn't see him. Oh, the callers. The 911 callers. Yes. All said they saw a gun. Officer Ysenio, very early on when Mr. Calangi is walking southbound on Jackson and passes in front of the officers and the officers' cars with lights going, says, and I'm reading from ER 0265, the appendix to the DA's report, and I'll preview and hopefully avoid any objections. Appellants cited the DA's report at least 10 times in their opening papers. Like Judge Friedland suggested, I never understood their argument to be that he didn't have a gun. Well, I'm confused what their argument was about the gun. You have to look at what they presented to the district court because that's what we're reviewing. We're reviewing the district court's ruling. And counsel may have misstated or mischaracterized or whatever, but we're looking at what was presented to the district court and what's presented to us. We can only assume when there's a – so everybody, there may be some factual disputes about some of the key events that took place. You may have a different version. He may have a different version. But for our purposes, we have to look at the version he presented. He's the non-moving party in this instance. They're the non-moving party. So we look at the evidence in the light most favorable to them. And if there's a factual dispute there and they prevail here, that factual dispute will be resolved at trial. But for our purposes, for purposes of qualified immunity, we're looking at the facts in the light most favorable to him. So he had a gun, right? But his main argument is that he didn't – he was not threatening to anybody. He wasn't threatening the officers, and he wasn't a threat to anybody else nearby, standing, you know, right – a passerby, right? If I may, they're using a very narrow definition of threatening in terms of pointing the gun at somebody. And I think they say that over and over in their papers, that they're pointing a gun. But Mr. Kalonji's behavior that afternoon was very threatening. Overall, he has a gun. He's waving the gun around in a parking lot. The officers know anything about waving a gun around in a parking lot. I didn't see any indication that at the time of the shooting, that at least the officer who did the shooting knew anything about waving a gun in a parking lot. I believe there is evidence in the record that suggests the officers were aware of the 911 calls. Yes, but the 911 call just said there's a guy with a gun, right? It didn't say anything about he's threatening people with it or waving it at people. I don't recall exactly about those words. You're right. If you have that record site, I'd like to see it as well. Right. I don't have that record site. But I do have the record site to the DA's report, which both sides have used in their arguments, where Officer Esenio did say he saw the gun. He had the gun, and that's at 2.32 p.m. and 19 seconds. I think we're assuming that he had a gun. Okay. So he's got the gun, and he's ignoring the commands, and there's arguments. But he's ignoring conflicting commands. Well, not necessarily. And the like most favorable. So just give us your best argument and the like most favorable to the plaintiff. Right, but they're grouping all the commands together, and it's not a situation where multiple people are constantly issuing different commands. If we look at Appendix B at ER 0265, Officer Esenio initially says, hands up, don't reach for it. Then he says that again a few seconds later, don't reach for the gun, because he sees the gun in the waistband. He had just put the gun in the waistband. I mean, watching the video, it really sounds like there are a lot of commands happening at once. Yes, but they're not all inconsistent. And then Officer Esenio says to him, get on the ground, and then a few seconds later,  Someone says, drop the gun. Someone says, don't touch the gun. How are those not inconsistent? That's later on when he's, when Mr. Kalonji appears to be reaching. So at 233, Officer Esenio says, he's reaching, watch him, he's reaching. So then Officer Carboni says, drop it. And then Esenio says, drop the gun. Don't reach for it. So he's got his back to them. The gun's in the waistband. Officer Esenio thinks he's reaching for the gun. Does he have the gun yet or not? So there's some confusion there because of Mr. Kalonji's actions of putting his hand toward the gun. In the light most favorable to the plaintiffs, though, he wasn't reaching for the gun. Okay, he wasn't reaching for the gun. He also wasn't complying with any of the commands for that minute and 20 seconds. So why don't Esteta, Lopez, and George tell us that if he wasn't reaching for the gun, he wasn't an immediate threat? I think a case that's cited in the Casella case, which we rely on, is the... I always forget the name. One second, sorry. The Blanford v. Sacramento City case, cited by Casella. It's a case from this court. 408 F. 3rd 1110 4-0 from the 9th Circuit, 2005. That's a very insightful case for this issue here. Officers are called to the scene. A man has a two-and-a-half-foot sword. He's acting erratically, and they get 9-1-1 calls. Is that Casella you're talking about right now? I'm talking about the Blanford case. That's cited in Casella? Cited in Casella, yes. Did you cite that separately? We did not cite that separately. Again, going back to the waiver issue, Collins never discussed Casella until their reply brief in the appeal. He had an obligation to apply the law. I understand, I understand. So in terms of... Both ways. Yes, absolutely. The Blanford case, the officers arrive on the scene. The man is acting erratically. He has a sword. There's nobody on the street. There's nobody near him. They just got calls. They follow him. They issue commands to him to drop the sword, things like that. He doesn't comply. What they don't know is he's got headphones on and he's got music playing very loudly, so he couldn't have possibly heard the commands. He continues to walk towards the house, the man with the sword. He looks to be fumbling for keys to try to get in. He doesn't get in the house. He tries to go in the backyard. The officers are concerned that he's got the sword. He's going to try to... He may encounter somebody in the backyard. He may try to get in the house. They don't want him to go out of his sight. They fire upon him at that point while he's trying to go in the backyard. They kick the gate down. They see him struggling to open a garage door, which is attached to the house. They fire upon him again, and he then continues to hold the sword. They're giving commands to drop the sword. He doesn't drop. They fire upon him again, hitting him in the spine, and he becomes a paraplegic. The court granted qualified immunity because the court concluded that a reasonable officer in their position would believe that the plaintiff presented an immediate threat of serious bodily injury to the persons in the house. They didn't know if anybody was in the house. But if he got in the house, that would be an immediate threat to anybody in the house. But here we don't have a house. Well, we have an apartment building right there as well. But I don't know how close he was because I didn't get a chance to read Blanford. But I know that you cite Casella, and you say it's on point. But there the officers were protecting bystanders. And here if we take the facts in the light most favorable to the plaintiff, which we're obligated to do, that's not the same situation here. Well, we do have a situation where Mr. Kalonji is approaching that intersection. And one issue that appellants have completely ignored is that it's a very busy intersection, and there are many cars at that intersection making turns and making U-turns. At the time of the shooting, Mr. Kalonji is only 20 yards or so from that intersection, certainly within striking distance of having a gun and shooting somebody. This is the concern that the officers had. And there's no dispute. It is on the body-worn camera videos. So in your view, if Mr. Kalonji had the gun in his waist, and didn't touch it, just had his arms at his side, that's sufficient to shoot him? We have a very dynamic situation where he continues to walk forward. And he only had... Officer Carboni says he only had... Hands not on the gun, just in his waist. That was sufficient for the officers to shoot him. I think it would depend about where he is located. Exactly. Where he's located. And in this instance, he shoots. Here, isn't there a dispute on whether or not he had his hand on the gun or was reaching for the gun? There's a dispute about that, or whether he would have had it in his waistband. And I think that's why this is so distinct, maybe, from some of the cases that you cited. You know, these excessive force cases are very difficult and very challenging. But I wanted to ask you whether... Why wasn't a warning given? Or I guess, was there a warning given? It doesn't seem like there was. And whether that has any effect on our decision, and whether a less intrusive force was possible. Well, there was not a warning given that if you don't drop the gun or stop walking, we will shoot. That was not given. But that's not given in Casella either. So the woman in Casella with a knife... But that person's about to hit the neighbor. That's not what the evidence... That neighbor never felt threatened. She never raised the knife. Okay, but there's a neighbor right there. Six feet away. Six feet away. Yes, there's a neighbor there. She's got a knife. She's not lifting. She's not approaching. But the officer said, or the court felt, that that was still in the striking zone. And so, therefore, in the urgency of the situation, the officer was not required to give a warning there. Here, we think because of the backdrop issue and where Mr. Kalonji was, Officer Carboni was going to lose that backdrop. And if he loses the backdrop, Mr. Kalonji is now closer to the intersection. They're in the picture, I believe, that you were shown. I didn't see it. There's a row of parked cars there. He's very close to the intersection. It's not time. The officers lose the ability to shoot him with a proper backstop that wouldn't harm other potential people out there. And so, even if he doesn't have it, if he's ready, if he's continuing to walk towards these cars, because it only takes a fraction of a second to take a gun out of your waist and start shooting people, yes, there's still that imminent threat of violence towards those cars and those disputed as there's people there. But I think, actually, there is a person caught on the body-worn camera of Officer McKenzie, if you look at that video, the San Jose Police Department video. He's in the parking lot across the street, literally directly across the street, from Mr. Kalonji. He's putting something in the back of his car, and then, literally, when the shot is fired, he's hustling through the parking lot. There are people out and about and around. And so, if he continues past that good backdrop, they lose the ability to fire appropriately, and he gets closer. And that imminent threat, like in the Blanford case, they didn't even know if there was anybody there. But there was an imminent threat because the person had a weapon, and if he got to somebody with that weapon, that would cause a significant bodily injury. And I think we're talking about disputes of fact. I don't know that their disputes raise a triable issue of fact. In terms of Officer Pedrera, when he was at the intersection, he said he was not looking around, really. He was looking in the crosswalk for a man with a gun. So he wasn't really paying attention. But we do have the... That's something you could cross-examine him about at trial. But at the moment, he has said there were no bystanders. He says he didn't see any, I believe. So taking the facts in the light most favorable to plaintiffs, we have to say he was there, and he didn't see any bystanders. I think we assume that means there weren't any. Right. But we still have the school getting out at 2.30, and I think there's evidence in the record that there was going to be another release of students at 2.30. And now we're at 2.32, and Officer Yacineo is concerned about these other students that will be coming. And why not put a police car near the school and say, don't go this way? Well, they did call the police there to go to the school, but we don't know. In our record, we don't know where they were set up and, you know, to control 1,000 students leaving would be a relatively impossible problem. Yeah, and why not shoot them in the leg? The officers are trained to shoot at the body mass, and so I know that comes up sometimes, but they're trained to shoot at the center mass. And I take it. Again, these are very difficult cases, but we're bound by looking at the light most favorable to the plaintiff here. And the students weren't out. I mean, maybe if the students were out and about and they were all around, but right now what we know is the gun was in his waistband, and there's a question about whether or not he was reaching for it, and the officer shoots him in the center back. So... I know we're focusing on the students, but we do have those vehicles there, and those people are entitled to protection, too, and there's a steady stream of vehicles making that turn at that intersection that Mr. Colonge is heading towards, and he's only 20 yards away or so at that point. And so they, along the lines of Blanford, are in imminent danger if within a second or less than a second he grabs that gun and starts firing upon them. I think I'm done. Thank you. Thank you. Am I out of time or not? I think you have like a minute 30. Okay. I can do it in a minute. Thank you. All right. Of course, there is a police car at the other end of the block, and I'm quoting in answer to your question, Judge Murgia, from our police practices report at ERO 190, and he says, and I quote, The glaringly obvious tactical necessity in this set of facts was to create a perimeter using police vehicles and personnel to cover blockage Mr. Colonge's forward movement to keep all civilian students out of the way. Officers are trained that the creation of a perimeter provides the opportunity for the use of less lethal tools, including tactical communications, kinetic weapons, chemical agents, electronic control weapons, et cetera, et cetera. There's no need to shoot a man in the back under these circumstances. Thank you. All right. Thank you very much, Mr. McManus and Mr. Gray. Appreciate your oral argument presentations. The case of Rosalina Colonge versus the city of San Jose is submitted.
judges: MURGUIA, PAEZ, FRIEDLAND